# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRIAN E. JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:19-cv-01160** |
| | ) | |
| **MIKE DOBBINS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Brian Johnson, a former inmate at the Williamson County Jail (the "Jail"), brings claims arising from the conditions of his confinement under 42 U.S.C. § 1983 for violations of his Eighth and Fourteenth Amendment rights, and for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. The defendants are Captain Mike Dobbins, former Jail Administrator; Dusty Rhoades, former Chief Deputy and current Williamson County Sheriff; Jeff Long, former Williamson County Sheriff; Dan VandenBosch, former Jail Lieutenant; and Chad Youker, current Jail Lieutenant and former Staff Sergeant ("Defendants"), all of whom Johnson alleges engaged in illegal treatment while he was in the Jail.

Before the Court are five motions for summary judgment by: (1) Dobbins (Doc. No. 112); (2) Rhoades (Doc. No. 114); (3) Long (Doc. No. 116); (4) VandenBosch (Doc. No. 118); and Youker (Doc. No. 120). Johnson opposes each except for Long, (Doc. Nos. 149–52), and Defendants have replied. (Doc. Nos. 153–57). For the following reasons, the motions will be granted.

## I.  MATERIAL UNDISPUTED FACTS

On December 19, 2017, Johnson was booked into the Jail wearing a brace on his right wrist that interferes with any activity requiring use of both hands. Johnson requested that he not be required to remove the brace, and Jail medical staff agreed.

The Jail's Inmate Classification Policy ("Policy") "has been developed to provide reasonable and necessary security and safe housing for the inmate population, while also providing for the protection of deputies and staff." (Doc. No. 147-8 at 1). For inmates, like Johnson, who have "special needs," the Policy provides that they "will be diverted to special housing when such housing space is available. Special housing units include protective custody, administrative separation, disciplinary separation and mental and medical health housing." (Id. at 2). The Policy specifically provides that "[i]nmates with disabilities, as determined by medical staff, including temporary disabilities, shall be housed and managed in a manner that provides for their safety and security." (Id. at 3).

At booking, because of Johnson's physical impairment, as well as security risks associated with his brace, the Jail's booking specialist Kelly Easterling classified Johnson as a "medical separation" inmate, which required that he be kept in a single-man cell pod 23 hours a day. Johnson's classification was documented in an Incident Report dated December 20, 2017, (Doc. No. 143-7), that was reviewed and initialed by Rhoades and VandenBosch. (Doc. No. 158 ¶ 10).

On April 12, 2018, Johnson was sentenced for a probation violation, along with a felony guilty plea. (Doc. No. 140 ¶ 34). He remained in medical separation for fifteen months from December 19, 2017 until March 20, 2019. (Doc. No. 158 ¶ 13). During that period of time, Johnson received approximately one hour daily of recreation time, during which he would socialize with inmates, attend to hygiene needs, send messages to prison staff, phone and text family, and deal with any other personal matters. (Doc. No. 140 ¶¶ 36–38, 43; see also Doc. No. 158 ¶ 11). The Jail

2

also permitted Johnson outdoor recreation. (Doc. No. 140 ¶ 135). According to Johnson, despite these privileges, he did not have "the ability to attend group classes," attend "religious services," or "hold a job." (Id. ¶¶ 136–38, 145, 151). However, during his Jail intake, he represented that he did not want to take educational or group classes, (id. ¶ 143), and while in custody, he never made any request for a job assignment or permission to attend religious services. (Id. ¶¶ 152, 154).

The Policy specifically tells inmates that they may challenge a housing classification by "using the grievance procedure." (Doc. No. 147-8 at 3). Johnson admits that he knew this and admits that he never filed a grievance about his housing classification. (Doc. No. 158 ¶ 12; see also Doc. No. 140 ¶¶ 104, 105, 119, 123, 168, 228). He explains that an unidentified Jail employee allegedly threatened him with discipline if he filed a grievance. (Doc. No. 140 ¶¶ 121). On March 2, 2018, Johnson asked a nurse about transferring to the general population. (Id. ¶ 112). The nurse told him to schedule an appointment with a doctor, but he never did. (Id. ¶¶ 69, 110–13, 117).

On March 20, 2019, due to a roof leak and Johnson's good disciplinary record, the Jail moved Johnson from medical separation into a dormitory pod with other medical separation inmates. (Id. ¶¶ 124, 125, 127–30; see also Doc. No. 158 ¶¶ 14, 16). There, Johnson was allowed to recreate and socialize more freely, and he did so until his release on June 13, 2019. (Doc. No. 140 ¶¶ 2, 132).

## II.  LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Griffith v. Franklin Cty., 975 F.3d 554, 566 (6th Cir. 2020) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion

3

and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III.    DISCUSSION

Defendants seek summary judgment on all claims because they are untimely or barred under the qualified immunity doctrine. As an initial matter, the Court will grant Long's motion because Johnson failed to file a response in opposition, L.R. 56.01(a), and because the Court finds it is otherwise well-taken. See Haddad v. Sec'y, U.S. Dept. of Homeland Sec., 610 F. App'x 567, 568–69 (6th Cir. 2015).

### A.  Timeliness of Section 1983 Claims

Section 1983 provides "a cause of action against any person who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law." McKnight v. Rees, 88 F.3d 417, 419 (6th Cir. 1996). The applicable statute of limitations is the "state statute of limitations applicable to personal injury actions under the law of the state in

4

which the § 1983 claims arises." Eidson v. Tenn. Dep't of Children's Servs., 510 F.3d 631, 634 (6th Cir. 2007). The parties agree that, in Tennessee, the relevant statute of limitations period is one year. (Doc. Nos. 113 at 12; 149 at 11); see also Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015).

Generally, "[i]n determining when the cause of action accrues in § 1983 cases, [the Court] look[s] to the event that should have alerted the typical lay person to protect his or her rights." Trzebuckowski v. City of Cleveland, 319 F.3d 853, 856 (6th Cir. 2003); see also Kuhnle Bros., Inc. v. Cty. Of Geauga, 103 F.3d 516, 520 (6th Cir. 1997) (internal quotations and citations omitted). If, however, the plaintiff challenges events that occurred outside the limitations period, then the plaintiff may use a continuing violation theory to save the claim. See Eidson, 510 F.3d at 634; Nat'l Parks Conservation Ass'n v. TVA, 480 F.3d 410, 416–17 (6th Cir. 2007) (collecting cases).

The continuing violation theory requires Johnson to satisfy three requirements. "First the defendants' wrongful conduct must continue after the precipitating event that began the pattern . . .. Second, injury to [Johnson] must continue to accrue after that event. Finally, further injury to [Johnson] must have been avoidable if the defendants had at any time ceased their wrongful conduct." Eidson, 510 F.3d at 634; see also Tolbert v. Ohio DOT, 172 F.3d 934, 940 (6th Cir. 1999). The first requirement necessitates that Johnson identify a discrete, unlawful act or acts occurring within and outside of the limitations period. Tolbert, 172 F.3d at 940. An act is discrete if it is an "easy to identify" event where the plaintiff: (1) was denied or refused a request by defendants; (2) suffered a distinct harm; or (3) had an ongoing adverse event reaffirmed by defendants. AMTRAK v. Morgan, 536 U.S. 101, 114 (2002); see also Goldsmith v. Sharrett, 614 F. App'x 824, 828–29 (6th Cir. 2015). If a plaintiff cannot identify specific discrete acts or events

5

within the limitations period, then the continuing violation theory does not apply. <u>Wallace v. Coffee Cty.</u>, No. 4:18-cv-25, 2020 WL 2946064, at *5 (E.D. Tenn. June 3, 2020) (finding Jail staff's refusal of inmate's requests to clean bedsheets or showers to be discrete but that the continuing violation theory did not apply because no such acts were identified within the limitations period); <u>Baker v. Mich. Dep't of Corr.</u>, No. 1:13-cv-284 2013, U.S. Dist. LEXIS 74287, at *17 (W.D. Mich. May 28, 2013) (rejecting continuing violation theory where inmate identified no wrongful conduct by Jail staff within the limitations period). Neither passive inaction nor the "continual ill effects from an original violation" constitute discrete, unlawful acts that would otherwise rescue a plaintiff's claims. <u>Eidson</u>, 510 F.3d at 635; <u>Bruce v. Correctional Medical Services, Inc.</u>, 389 F. App'x 462, 463 (6th Cir. 2010) (noting passive inaction is insufficient to support a continuing violation theory); <u>see also</u> <u>Durham v. Mohr</u>, No. 2:14-cv-581, 2015 U.S. Dist. LEXIS 119963, at *15 (S.D. Ohio Sept. 9, 2015) (same).

These principles were applied by the Sixth Circuit in <u>Eidson</u>. There, the Tennessee Department of Children's Services removed Ronald Eidson's children from his custody on November 18, 2003 due to false sexual assault allegations. 510 F.3d at 633. On October 22, 2004, after the allegations were recanted, the Department returned custody to Eidson. <u>Id.</u> at 634. Over a year later, on October 24, 2005, Eidson sued the Department under § 1983 for violations of his Fourteenth Amendment rights. <u>Id.</u> Eidson conceded that the statute of limitations for his claims was one year and that the precipitating event—the initial November 2003 removal of his children—occurred outside that period. <u>Id.</u> at 635. Nonetheless, he argued that the continuing violation theory saved his case because of the Department's "continuing wrongful conduct" of withholding his children "from the date of the initial removal through" their eventual return. <u>Id.</u> The Sixth Circuit rejected Eidson's argument. The Court's reasoning focused on the Department's

initial decision to revoke Eidson's custody. After that event, the Department did not engage in any additional, "affirmative" conduct implicating "any deprivation of liberty without due process." Id. at 637.

Likewise, here, Johnson's claims all center around the legality of his initial housing classification on December 19, 2017. In fact, Johnson refers to his housing classification – which he calls "23:1 isolation/solitary confinement" – no fewer than 209 times in both the Complaint or Amended Complaint. By way of example, the first paragraph of the Complaint and Amended Complaint alleges that Defendants violated Johnson's Eighth and Fourteenth Amendment rights by placing him in "23:1 isolation/solitary confinement. . .[u]pon his entry" into the Jail and keeping him there for "fifteen months." (Compl. at 1; see also Am. Compl. at 1). Johnson further asserts that Defendants had no legal, "valid penological reason" for holding him in that housing classification following his initial placement. (Compl. ¶¶ 52–53, Am. Compl. ¶¶ 52–53). He then alleges that Defendants were each aware of, and responsible for, his initial placement into 23:1 confinement. (Compl. ¶¶ 89–118; Am. Compl. ¶¶ 90–125). That Johnson was placed and kept in 23:1 confinement on medical separation housing is the heart and soul of his case.

The Complaint challenging Johnson's housing classification was filed on December 26, 2019, more than two years after the Jail made the decision to assign him to medical separation. This lawsuit is clearly time-barred unless Johnson can present admissible evidence from which a jury can find that his § 1983 claims arise from a continuing violation. The burden of proof is on Johnson to establish his continuing violation theory. Eidson, 510 F.3d at 635; Tolbert, 172 F.3d at 940. He fails to do so on summary judgment because the only discrete act he relies upon is the Jail's decision on December 19, 2017 to place him in medical separation. (Compl. ¶¶ 42, 44, 53, 88, 104–08; Am. Compl. ¶¶ 42, 44, 54, 88, 108–12). Indeed, each of Johnson's § 1983 claims flow

directly back to that initial placement decision. There is no evidence or allegations that the Jail made any new housing decision or reaffirmed that decision after December 19, 2017 until Johnson was moved to a dormitory pod on March 20, 2019. (Doc. No. 158 ¶ 16).

Johnson argues that Defendants knew of his longstanding desire to leave medical separation and refused to heed his requests. (Doc. No. 151 at 16). He also asserts that Defendants each held positions of authority that required them to act, and that their failure to do so constituted wrongful conduct within the limitations period. These arguments fail legally and factually. First, Johnson's undisputed avenue to challenge his housing assignment was to file a grievance. His hope, desire, or prayer is irrelevant. Second, Johnson fails to present evidence that any of the Defendants unilaterally or together had authority to change his housing assignment without a grievance by him. Third, there is no evidence that the Jail re-visited his initial housing assignment after December 19, 2017.

Johnson's attempt to create genuine disputes of material fact by recycling objections across dozens of asserted undisputed facts about Defendants' conduct are without merit. The Court will highlight two such responses to show why. First, in response to Defendants' interaction with him, Johnson used the following form response:

> **Statement of Undisputed Fact No. 267**: Neither Plaintiff nor his family ever spoke to Long, Rhoades, Dobbins, or VandenBosch . . .:
>
> **RESPONSE**: DISPUTED as stated. The Duties of the Sheriff included the running of the Williamson County Jail, including ensuring the safety and security of inmates in its care. (Compare Ex. 40, Long Dep. 39:4–11 with Ex. 41, Rhoades Dep. 89:6–10). Further, Defendant Rhoades reviewed and signed each incident report sending Mr. Johnson into medical separation and confinement for more than 23 hours, on average, per day in solitude with no outdoor time and no meaningful review with respect to being released from those conditions. (Ex. 41, Rhoades Dep. 103:8–18; Ex. 3, Jail Incident Report 7/14/16; Ex. 5, Jail Incident Report 10/1/16; Ex. 6, Jail Incident Report 12/6/17; Ex. 7, Jail Incident Report 12/19/17).

(Doc. No. 140 ¶ 267; see also id. ¶¶ 234–41, 246–49, 268, 270–71, 274, 276, 278–81).

8

Second, in response to whether Defendants were responsible for placing him in medical separation or had knowledge of his conditions of confinement, Johnson used the following, recurrent objection:

> **Statement of Undisputed Fact No. 311**: [Defendants are] not responsible for reviewing and approving the placement of inmates on medical separation, although an inmate could always write a request or grievance to have that status revised . . . . Dobbins was not aware whether Plaintiff attended classes, participated in religious services, or held a job while in the Jail. (Dobbins Depo., p. 112, lines 16–24).

> **RESPONSE**: DISPUTED as stated. All housing at Williamson County Jail that was not general population was 23 and 1 confinement. (Ex. 21, Youker Dep. 137:18–25). Defendant [Dobbins, Rhoades, VandenBosch, or Youker] was [in a position of authority] of the Williamson County Jail. (Ex. 13, VndenBosch [sic] Dep. 97:4–9). During this time, Mr. Johnson was held in confinement for more than 23 hours, on average, per day in solitude with no outdoor time and no meaningful review with respect to being released from those conditions. (Ex. 21, Youker Dep. 137:18–25; Ex. 3, Jail Incident Report 7/14/16; Ex. 5 Jail Incident Report 10/1/16; Ex. 6, Jail Incident Report 12/6/17; Ex. 7, Jail Incident Report 12/19/17). Defendant VandenBosch reviewed the reports and passed to Defendant Dobbins. (Ex. 13, VndenBosch [sic] Dep. 97:4–9).

(Id. ¶ 282; see also id. ¶¶ 283, 287–89, 304–07, 311).[1] These objections hardly create disputed issues of fact because they are not responsive, violating the Federal Rules of Civil Procedure and Local Rules of this Court. See Fed. R. Civ. P. 56(c), (e); L.R. 56.01(c) (noting that a party must demonstrate that the stated fact is disputed with support by a specific, *responsive* citation to the record). Where a party "fails to properly address another party's assertion of fact," the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2); see also Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence, 910 F.3d 270, 281 (6th Cir. 2018) (affirming the district court's grant of summary judgment based upon failure to "directly address"

---

[1]    Johnson repeats similar, canned responses throughout Defendants' statement of undisputed facts. (See Doc. No. 140 ¶¶ 7–8, 12, 17–18, 23, 26–29, 32, 39–43, 45–61, 64, 66–72, 74–77, 85–88, 89–93, 98–99, 102–105, 108–114, 117–121, 127–131, 135–138, 140–41, 147–51, 154–57, 162–64, 167–79, 194–96, 198–99, 205–15, 217, 220, 222–25, 227, 313–14).

9

factual assertions); <u>Sasser v. ABF Freight Sys.</u>, 219 F. Supp. 3d 701, 705 (M.D. Tenn. 2016) (failure to address factual assertions deems those facts undisputed for purposes of summary judgment).

Johnson's reliance on three incident reports dated July 14, 2016, October 1, 2016, and December 6, 2017 are of no material importance here. First, each are outside the limitations period. Second, each were created by Jail staff not Johnson. Third, none identify a discrete event or act by the Jail pertaining to his housing after December 26, 2018. Fourth, none constitute a grievance about his housing classification.

Turning to each defendant, there is no admissible evidence they engaged in any action to save Johnson's 1983 claims on a continuing violation theory. Johnson fails to identify any discrete act by any Defendant within the limitations period that comes close to a refusal or denial reaffirming his initial placement into medical separation. <u>AMTRAK</u>, 536 U.S. at 114; <u>Goldsmith</u>, 614 F. App'x at 828–29. Instead, at every phase of his incarceration, Johnson retained the burden to follow the Jail's grievance procedure in order to request review of his housing classification. (Doc. No. 147-8 at 3). He knew how to file a grievance and could have submitted one at any time; however, he chose not to do so. (Doc. No. 140 ¶¶ 106, 169, 170, 311). Johnson argues that he was stonewalled not by any Defendant but by an unidentified Jail staffer who threatened him with discipline due to his repeated requests about personal matters. (<u>Id.</u> ¶ 24). But this testimony is inadmissible hearsay. <u>See</u> Fed. R. Evid. 801. Having reviewed the record in the light most favorable to Johnson, no reasonable juror could conclude that any Defendant engaged in any material conduct within the limitations period. Johnson's § 1983 claims against each Defendant are time-barred and must be dismissed.

Dobbins

As Jail Commander and Captain of the detention division, Dobbins' responsibilities primarily involved budgeting and technology. (Id. ¶ 284). He never interacted with Johnson. Neither did Johnson's family contact him about any matter. (Id. ¶ 267). Indeed, Johnson admitted that he would not know Dobbins if he saw him. (Id. ¶ 289). Critically, Dobbins was not responsible for placing Johnson in medical separation housing. (Id. ¶ 276).

Despite these undisputed facts, Johnson argues that Dobbins acted within the limitations period because he: (1) reviewed the December 19, 2017 incident report following his initial placement into medical separation; and (2) continually "ratified, implicitly authorized, approved, and knowingly acquiesced to [his] placement" after December 26, 2018 as Jail Commander throughout Johnson's incarceration. (Doc. No. 149 at 11–12). Even if true, these allegations fall short of an identifiable, discrete act by Dobbins. At best, Johnson suggests that Dobbins implicitly approved his placement into medical separation by virtue of his position as Jail Commander. But such an argument amounts to the type of passive inaction or continual ill effects of the initial decision, which is insufficient to establish a continuing violation. See Moss v. Columbus Bd. of Educ., 98 F. App'x 393, 396 (6th Cir. 2004) (noting that a "continued violation requires continued action and not simply continuing harm or 'passive inaction'"); Eidson, 510 F.3d at 637.

Having reviewed the record in the light most favorable to Johnson, no reasonable juror could conclude that Dobbins engaged in any wrongful conduct within the limitations period. The Court concludes that Johnson's § 1983 claim against Dobbins are time-barred.

Rhoades

As Chief Deputy, Rhoades assisted the sheriff with office operations and acted in the sheriff's capacity when needed. (Doc. No. 140 ¶ 234). He relied on Jail staff to run the Jail,

including the placement of inmates into housing classifications. (Id. ¶¶ 235, 239). Rhoades did not know any particular inmates' housing classification or have substantive input, including that of Johnson. (Id. ¶ 239). He visited the Jail, at most, on a monthly basis to review the status of the building as a whole, rather than particular cell pods or inmates. (Id. ¶ 236). Johnson never spoke to Rhoades about any matter. (Id. ¶ 267).

Johnson makes the same arguments against Rhoades regarding his review of the initial housing placement and his implicit authorization and ratification of same as he did for Dobbins. (Doc. No. 150 at 21), which fail for the same reasons as they did for Dobbins.

Having reviewed the record in the light most favorable to Johnson, no reasonable juror could conclude that Rhoades engaged in any wrongful conduct within the limitations period. The Court concludes that Johnson's § 1983 claims against Rhoades are time-barred.

VandenBosch

VandenBosch left his employment with the Jail on January 3, 2019, (Doc. No. 140 ¶ 302), so Johnson must identify conduct between December 26, 2018 and January 3, 2019 in order to establish a continuing violation. He does not do so. VandenBosch never interacted with Johnson or spoke with deputies about him. (Id. ¶ 304). Johnson admits that he only sued VandenBosch because "[h]e was in charge." (Doc. No. 140 ¶ 303). Johnson filed a grievance for review throughout his incarceration. (Id. ¶ 308). Had he filed a grievance, VandenBosch would have seen the request. (Id.). However, Johnson never filed one, (Id. ¶ 105) so that never happened.

Johnson nonetheless contends that on or after December 26, 2018, VandenBosch had responsibility for overseeing "floor operations, including where people are housed" and performed "routine reviews of inmates in administrative segregation every 90 days, which included going into Johnson's cell pod." (Doc. No. 151 at 16). Because of these actions, Johnson believes that

12

VandenBosch could have, but consciously refused, to review his housing placement, thereby extending accrual of his claims. (Id.). Yet, even if true, this would amount to a failure to act, which is not a discrete affirmative act. Having reviewed the summary judgment record in the light most favorable to Johnson, no reasonable juror could conclude that VandenBosch engaged in any wrongful conduct during the nine days he remained employed by the Jail within the limitations period. Accordingly, the Court concludes that Johnson's § 1983 claims against VandenBosch are time-barred.

Youker

Youker became Staff Sergeant in the detention division on January 1, 2018 and was promoted to Lieutenant on January 28, 2019. As Staff Sergeant, his role included performing rounds and overseeing floor operations. However, he was not involved in Johnson's initial placement into medical separation and did not review the December 19, 2017 incident report. (Doc. No. 140 ¶¶ 292, 311–14). Although Youker does not dispute that he spoke with Johnson generally about his housing status, Johnson admits that he does not remember what Youker said, when he said it, or what was said in response. (Id. ¶ 298). Youker reviewed grievances, but not one on Johnson's housing classification. (Id. ¶ 105).

Johnson has not identified admissible evidence establishing that Youker engaged in any "easy to identify" act of denial or refusal regarding Johnson's housing classification during the limitations period. AMTRAK, 536 U.S. at 114; Goldsmith, 614 F. App'x at 828–29. Having reviewed the summary judgment record in the light most favorable to Johnson, no reasonable juror could conclude that Youker engaged in any wrongful conduct on or after December 26, 2018. Accordingly, the Court concludes that Johnson's § 1983 claims against Youker are time-barred.

13

B.  Qualified Immunity

Even were Johnson's § 1983 claims timely, Defendants would be entitled to qualified immunity. Public officials, including jail officers, are entitled to qualified immunity from a suit for civil damages if either the official's conduct did not violate a constitutional right or if that right was not clearly established at the time of the conduct. Godawa v. Byrd, 798 F.3d 457, 462–63 (6th Cir. 2015) (citing Saucier v. Katz, 533 U.S. 194, 201–02 (2001)). Courts may choose the order to analyze these questions, and if they answer either one in the negative, qualified immunity applies. See Hernandez v. Boles, 949 F.3d 251, 259 (6th Cir. 2020) (citing Goodwin v. City of Painesville, 781 F.3d 314, 320–21 (6th Cir. 2015)).

Eighth Amendment

Johnson asserts that Defendants subjected him to conditions of confinement that violated the Eighth Amendment in three ways: (1) by placing him in separated housing; (2) by limiting his recreation time; and (3) by depriving him of educational classes, religious programming, and work. (Doc. No. 151 at 9–10; see also Doc. No. 140 ¶¶ 136–38, 145, 151). It is axiomatic that the Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; Whitley v. Albers, 475 U.S. 312, 318–19 (1986). These protections extend to an inmate's conditions of confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994) (interpreting the Eighth Amendment as imposing an affirmative duty on prison officials to "provide humane conditions of confinement"). An Eighth Amendment violation occurs if a prison official acts with deliberate indifference to a prisoner's health or safety regarding his conditions of confinement. See Helling v. McKinney, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims); see also Mingus v. Butler, 591 F.3d 474, 479–80 (6th Cir. 2010).

14

To show an Eighth Amendment violation, Johnson must satisfy the two-part inquiry fashioned by the Supreme Court in Farmer. First, he must demonstrate that the conditions of confinement are "objectively, sufficiently serious" to a layperson and resulted in the denial of the "minimal civilized measure of life's necessitates," including food, clothing, shelter, sanitation, medical care, or personal safety. Farmer, 511 U.S. at 834; see also Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Peoples v. Bauman, No. 16-2096, 2017 U.S. App. LEXIS 27528, at 16–17 (6th Cir. Sept. 5, 2017). Under the objective prong, courts have found that an inmate must show that conditions of confinement are serious when viewed within the context of "contemporary standards of decency." Helling, 509 U.S. at 36. Second, Johnson must show that Defendants acted with a "sufficiently culpable state of mind." Farmer, 511 U.S. at 833; see also Rhodes, 452 U.S. at 347. This means that Johnson must show that Defendants "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety; [they] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Farmer, 511 U.S. at 837.

### Fourteenth Amendment

Johnson also asserts Defendants infringed on his procedural Fourteenth Amendment rights by subjecting him to medical separation without any periodic review. (Doc. No. 149 at 10). The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; see also Bazzetta v. McGinnis, 430 F.3d 795, 801 (6th Cir. 2005). Courts employ a two-step inquiry when analyzing such claims: "the first asks whether there exists a liberty or property interest which has been interfered with by the State." Ky. Dep't of Corrs. v. Thompson, 490 U.S. 454, 460 (1989). An inmate retains a liberty interest, "guarded by due process" for "state-imposed prison discipline that rises to the level of an

'atypical and significant hardship on the inmate' in relation to "the ordinary incidents of prison life." Harden-Bey v. Rutter, 524 F.3d 789, 793, 795 (6th Cir. 2008). The second phase of the inquiry asks whether the "procedures attendant upon" the interference of an inmate's liberty interest "were constitutionally sufficient." Ky. Dep't of Corrs., 490 U.S. at 460.

Supervisory Liability against Dobbins and Rhoades

Johnson brings his § 1983 claims against Dobbins and Rhoades under a supervisory liability theory. "In order to succeed on a supervisory liability claim," Johnson must show that "a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate" through the execution of his job functions. Garza v. Lansing Sch. Dist., 972 F.3d 853, 865 (6th Cir. 2020); see also Peatross v. City of Memphis, 818 F.3d 233, 241 (6th Cir. 2016).

But supervisory liability has "sharp limits," and will "not attach for 'a mere failure to act.'" Crawford v. Tilley, 15 F.4th 752, 761 (6th Cir. 2021). Rather, Johnson must "show that the supervisors somehow encouraged or condoned the actions of their inferiors," Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006), through personal involvement and "active unconstitutional behavior." Peatross, 818 F.3d at 241; see also Miller v. Calhoun Cty., 408 F.3d 803, 817 n.3 (6th Cir. 2005). Put another way, Johnson's section 1983 claim "must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." Cardinal v. Metrish, 564 F.3d 794, 802–03 (6th Cir. 2009).

Dobbins is entitled to qualified immunity because Johnson cannot show that he personally engaged in any conduct that violated a constitutional right under a supervisory liability theory. Godawa, 798 F.3d at 462–63 (citing Saucier, 533 U.S. at 201–02). Specifically, there is a void of

16

evidence that Dobbins engaged in actions that supported a finding of deliberate indifference or that he interfered with Johnson's ability to file a grievance on his housing classification. As Jail Commander and Captain of the detention division, he did not have any significant role in day-to-day operations of the Jail and would not interact with inmates. Indeed, Dobbins never interacted with Johnson during his incarceration. Johnson even admits that he would not know Dobbins if he saw him. (Id. ¶ 289). Dobbins was not responsible for placing Johnson in medical separation housing, nor was he aware of the conditions of Johnson's confinement. (Id. ¶ 276).

Johnson's argument tries to attach liability on Dobbins because he "implicitly authorized, approved, [and] knowingly acquiesced in the unconstitutional conduct of" others who kept him in medical separation without penological justification or periodic review. This argument fails as a matter of law because it relies on a "failure to act," which is legally unsupported. Crawford, 15 F.4th at 761. There is simply no admissible evidence, direct or indirect, that supports a conclusion that Dobbins engaged in "active unconstitutional behavior." Peatross, 818 F.3d at 241; see also Miller, 408 F.3d at 817 n.3. Having reviewed the record in the light most favorable to Johnson, no reasonable juror could conclude that Dobbins personally engaged in any unconstitutional conduct under a supervisory liability theory. Accordingly, the Court concludes that Dobbins is entitled to qualified immunity.

Rhoades is also entitled to qualified immunity because Johnson fails to identify any personal, unconstitutional conduct by him under a supervisory liability theory. There is no admissible evidence that Rhoades did anything that comes close to deliberate indifference to Johnson's needs or that he interfered with Johnson's ability to obtain a review of his housing classification. Rhoades only assisted the sheriff with office operations and acted in the sheriff's capacity when he was unavailable. He did not know Johnson's housing classification or conditions

of confinement. He visited the Jail, at most, on a monthly basis and there is no evidence that Johnson asked Rhoades for assistance or Rhoades did anything involving Johnson.

Having reviewed the record in the light most favorable to Johnson, no reasonable juror could conclude that Rhoades personally engaged in any unconstitutional conduct under a supervisory liability theory. <u>Godawa</u>, 798 F.3d at 462–63 (citing <u>Saucier</u>, 533 U.S. at 201–02). The Court concludes that Rhoades is entitled to qualified immunity.

<u>Failure to Intervene against VandenBosch and Youker</u>

Johnson's § 1983 claims against VandenBosch and Youker proceed under a failure to intervene theory. To establish a failure to intervene, Johnson must "demonstrate that [VandenBosch and Youker] '(1) observed or had reason to know that [the constitutional harm] would be or was [taking place], and (2) had both the opportunity and means to prevent the harm from occurring.'" <u>Holloran v. Duncan</u>, 92 F. Supp. 3d 774, 793 (W.D. Tenn. 2015) (citing <u>Sheffey v. City of Covington</u>, 564 F. App'x 783, 793 (6th Cir. 2014)). Johnson must also show that VandenBosch and Youker were personally involved in any alleged constitutional violation. <u>See Miller</u>, 408 F.3d at 817 n.3. Whether a failure to intervene theory is available to Johnson is doubtful because several district courts have concluded that "prison officials do not clearly have a duty to intervene beyond the context of excessive force claims." <u>Glover v. Rivas</u>, No. 2:19-cv-13406, 2021 U.S. Dist. LEXIS 47786, at *20 (E.D. Mich. Mar. 15, 2021) (collecting cases); <u>see also Dittmer v. Corizon Health</u>, No. 20-cv-12148, 2020 WL 6544784, at *21 (E.D. Mich. Nov. 6, 2020) (noting that "the Sixth Circuit has never extended the failure to intervene to medical treatment" in the context of an Eighth Amendment deliberate indifference claim.

Regardless, VandenBosch is entitled to qualified immunity because Johnson cannot show that he personally engaged in any conduct that violated a constitutional right under a failure to

18

intervene theory. VandenBosch was not involved in Johnson's placement into medical separation on December 19, 2017 and had no knowledge that Johnson wanted to change. Moreover, even if VandenBosch had such knowledge, he had no authority to do so. He did not speak with Johnson about his conditions of confinement. (Id. ¶¶ 267, 304). He did not speak with other deputies about Johnson. (Id.). Johnson even admits that VandenBosch never mistreated him. (Id. ¶ 51). Based on these undisputed facts, no reasonable juror could conclude that VandenBosch knew any unconstitutional harm would be or was taking place, or that he failed to stop it. Accordingly, the Court concludes that VandenBosch is entitled to qualified immunity. Godawa, 798 F.3d at 462–63 (citing Saucier, 533 U.S. at 201–02).

Youker is similarly entitled to qualified immunity because Johnson cannot show that he personally engaged in any conduct that violated a constitutional right under a failure to intervene theory. Youker was not involved in Johnson's initial placement into medical separation and did not review the December 19, 2017 incident report. (Doc. No. 140 ¶¶ 292, 311–14). Although Youker does not dispute that he spoke with Johnson generally about his housing status, Johnson testified that he does not remember what he said, when he said it, or what Youker said in response. (Id. ¶ 298). Johnson even testified that he got along well with Youker and that he did not have any complaints about how Youker treated him. (Id. ¶ 298). Based on these undisputed facts, no reasonable juror could conclude that Youker knew any unconstitutional harm would be or was taking place, or that he failed to stop it. Accordingly, the Court concludes that Youker is entitled to qualified immunity. Godawa, 798 F.3d at 462–63 (citing Saucier, 533 U.S. at 201–02).

C. ADA Claims

Johnson's ADA official capacity claim against Defendants fails as a matter of law. It is well-settled that "individuals sued in their official capacities stand in the shoes of the entity they

represent." Alkire v. Irving, 330 F.3d 802, 810 (6th Cir. 2003) (citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)). Johnson's ADA claim is therefore actually a claim against the Jail itself. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits . . . represent only another way of pleading an action against an entity of which an officer is an agent."). Johnson argues that the Jail failed to provide him a reasonable accommodation moving him out of 23-1 confinement. (Doc. No. 152 at 8; see also Am. Compl. ¶¶ 213–19).

To establish a prima facie case of disability discrimination under the ADA for failure to accommodate a disability, Johnson must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the service, with or without a reasonable accommodation; (3) the defendants knew or had reason to know of his disability; (4) he requested an accommodation; and (5) the defendants failed to provide the necessary accommodation. Mosby-Meacham v. Memphis Light, Gas & Water Div., 883 F.3d 595, 603 (6th Cir. 2018).

Even assuming Johnson could establish the first three prima facie elements, he fails at the fourth. If a plaintiff requires a reasonable accommodation, he is "saddled with the burden of proposing an accommodation and proving that it is reasonable." Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 202 (6th Cir. 2010); see also Shaikh v. Lincoln Mem'l Univ., 608 F. App'x 349, 353 (6th Cir. 2015) (noting that a plaintiff bears the burden of proposing a reasonable accommodation). Put another way, under the ADA, "[p]rison officials need not anticipate an inmate's unarticulated need for accommodation or to offer an accommodation *sua sponte*; the inmate must . . . request an accommodation." Bolz v. Collier, No. 1:16-cv-503, 2019 U.S. Dist. LEXIS 87859, at *13–14 (E.D. Tex. Apr. 17, 2019).

Here, there is no genuine dispute of material fact that Johnson never requested a reasonable accommodation or proposed an accommodation during his incarceration. (Doc. No. 140 ¶ 206). Johnson claims that he verbally campaigned to leave medical separation, (id. ¶ 104); however, he also never filed a formal grievance to request his desired accommodation – a new housing classification. (Doc. No. 143-1 at 182:24–183:7; see also Doc. No. 147-8 at 3). It is also undisputed that Johnson knew how to submit messages to medical staff regarding any health needs, (Doc. No. 143-33), and kiosk requests to the Jail community regarding any other personal matters. (Doc. No. 140 ¶ 123). While Johnson sent messages to Jail staff nearly every month during his time in medical separation, he never filed a request of any kind for a reasonable accommodation. The closest Johnson came to such a request was a message to a Jail nurse regarding clearance to the general population, (Id. ¶¶ 107–08), and even then, such a request occurred outside the limitations period. (See Doc. No. 147-8 at 3). Nor does Johnson dispute that, after the nurse informed him that he had to schedule an appointment with a doctor, he never did so. Therefore, even after reviewing the record evidence in the light most favorable to Johnson, the Court concludes that no reasonable juror could find that Johnson proposed a reasonable accommodation.

To the extent Johnson argues that Defendants failed to provide a series of *post hoc* reasonable accommodations that Johnson did not request during his incarceration – including transfer into an open dormitory for sex offenders – such an argument also is insufficient as a matter of law. A plaintiff claiming ADA violations under a failure-to-accommodate theory cannot rely upon after-the-fact accommodations that were never actually proposed. Shaikh, 608 F. App'x at 354 (rejecting after-the-fact accommodations that were not proposed during the facts of the case). Johnson does not point to any record evidence establishing that he requested transfer into an open pod for sex offenders, or anywhere else, during his incarceration. And even were he to have done

so, Johnson fails to prove how such *post hoc* accommodations would have been reasonable. Id.; Jakubowski, 627 F.3d at 202; Mbawe, 751 F. App'x at 840.

Here, the undisputed record establishes that Johnson's reassignment to housing for sex offenders would have fundamentally altered the safety and security of both his and the sex offenders' incarceration. See Keller v. Chippewa, 860 F. App'x 381, 385 (6th Cir. 2021). Johnson does not dispute that sex offenders would be in danger if they comingled with other inmates like him. (Doc. No. 140 ¶ 220). Further, his transfer into that housing, or anywhere else, would create a security concern due to the contents of his brace, thereby altering the nature of the services provided by the Jail. (Id. ¶ 30). Thus, even after reviewing the record evidence in the light most favorable to Johnson, the Court concludes that no reasonable juror could find that Johnson's *post hoc* accommodations were reasonable.

Likewise, Johnson's new argument that Defendants' failed to appoint an ADA coordinator exacerbated any violation of his rights is rejected.

## IV.    CONCLUSION

For the foregoing reasons, Johnson's claims are time-barred, and Defendants are entitled to qualified immunity. Accordingly, Defendants' motions will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

22